## HUDSON et ux. v. UNITED STATES.
### Civ. A. No. 2532.

United States District Court
W. D. Louisiana, Monroe Division.

Aug. 23, 1950.

Fred G. Hudson, Jr., Hudson, Potts, Bernstein & Davenport, all of Monroe, La., for plaintiffs.

Malcolm E. Lafargue, William J. Flenken, Shreveport, La., Theron Lamar Caudle, Assistant Attorney General, Andrew D. Sharpe, Robert R. Reynolds, Jr., Special Assistants to the Attorney General, for defendant.

DAWKINS, Chief Judge.

These complainants, husband and wife, seek to recover back from the Government the net sum of $827.48 out of a total of $1,300.65 alleged to have been paid by each of them under protest, at the instance of the Internal Revenue Department, as deficiency income taxes for the year 1941, which payments were later found to be not due in the major part in a test case between another taxpayer and the Government, growing out of identically the same facts and circumstances.

The defense is a plea of prescription of two years under Section 322(b) (1), 26 U. S.C.A., requiring that such claim for refund

be filed within that period after payment of the claimed deficiency.

There is only one disputed issue of fact, and that is as to whether the claims for refund were lawfully made within the time allowed. Otherwise, the undisputed facts are found to be as follows:

Plaintiffs made timely returns of their income taxes under the community system of this state, and in those returns, called attention to the circumstances under which the disputed liability for additional taxes arose, adding therein: "I am advised that this property is of an 'indeterminate' value and that any gain or loss is not now reportable." Thereafter, the local deputy internal revenue collector at Monroe, one John I. Kennedy, made demands of and collected from the complainants the whole of the claimed deficiency of $1,300.65 each, which was paid, after the said deputy collector "had explained to Mr. Hudson that it was to the taxpayer's advantage so to do, because, if the test case pending elsewhere by another stockholder should determine the value of taxpayer's gain from the mineral distribution was taxable as an ordinary dividend, then the taxpayer would save having to pay considerable interest; while should the test case go in taxpayer's favor, entirely or partially, taxpayer could obtain refunds with interest."

The litigated or test case was compromised and settled upon a basis which applied to all of the taxpayers, with the result that plaintiffs were entitled to have refunds of the amounts here claimed, $827.48 each, with legal interest at 6% from September 22, 1944, the date of payment. The test case was conducted in the name of one of the larger stockholders in the enterprise, from whose operations the claimed deficiencies arose. The action was fixed for trial before the Tax Court of the United States on November 26, 1945, but prior to that date the compromise was agreed upon. The claims for refund were timely made and paid to all of the taxpayers other than these complainants, including their brother.

### Were the claims for refunds here timely made?

The evidence offered by the complainants, consisting of affidavits, correspondence and other documents which, by consent, have been received for their full probative value (as if testified to and produced in open court by the parties) is to this effect:

Demands for the payment of the deficiencies were made on November 18, 1944, by form letter from the Acting Internal Revenue Agent in charge against each complainant for the sum paid, but the two checks in the sum of $1,300.65 each had been issued on September 22, 1944, and bear the stamp of the Collector of Internal Revenue for the State of Louisiana as of October 3 of that year.

Complainants have filed copy of the letter bearing date of March 20, 1946, verified as to genuineness and as having been timely written and mailed (Exhibit C-1), addressed to the Collector in New Orleans, reading as follows:

"March, 20" 1946
"Collector Internal Revenue,
Custom House
New Orleans, Louisiana
 Sir,
"I enclose you herewith claims on behalf of my wife, Mrs. True M. Hudson and myself, for refunds of amounts of $1300.65 each, with interest; which amounts were by us paid on September 22", 1944, by reason of a deficiency assessment by your office levied against us for 1941 income taxes due.

"I paid these assessments at that time to and upon the demand of your local agent, J. I. Kennedy (having theretofore executed for him a waiver) in order to save the running of interest. He then assured me that prompt refund would be made in the event the test case then pending in Chicago were finally decided favorable to the taxpayer, a Mrs. Charlotte G. Bancroft; of which proceeding he has made a full report.

"This matter involves a determination of the propriety of the allowance or dis-allowance as income for 1941 of an undivided interest of mineral rights received by the taxpayer during that taxable year as a distribution in kind, made by the Tensas Delta Land Company of Chicago and Grand Rapids, Michigan to it's (sic) stockholders.

"Mr. Kennedy has recently suggested that, *enev (sic)* though that litigation is not yet concluded, a claim should be filed to protect my rights and those of my wife. Hence, same is enclosed herewith. I understand that nothing will be done with this matter until after the final conclusion of the Bancroft suit.

"Yours very truly,
"cc J. W. Savage,
43; Inc."

To this letter is attached carbon copy of claims filled out on a printed form provided by the Internal Revenue Department. This was within the two-year period by six months from September 22 or October 3, 1944, whichever be taken as the date of payment. Copies of the pleadings and proceedings in the test case before the Tax Court involving the issue common to all stockholders were also made part of this record. The record also includes an affidavit by Walter S. Savage, a well-known certified public accountant and tax expert, who helped and advised the taxpayers in making their income tax returns, and in the preparation of the claims for refunds, to the effect that he, affiant in his said capacity, "is thoroughly familiar with the item of 1941 income of said taxpayer consequent upon a distribution of mineral interests made by the Tensas Delta Land Company in December, 1941; that he prepared 1941 returns for F. G. Hudson, Jr., and his wife, Mrs. True M. Hudson, and, thereupon as shown by copy there in affiant's said file, was noted the following:" The affidavit then recites, in substance that under date of December 27, 1945, the attorney representing the taxpayer in the test case "addressed a letter, copy of which is in affiant's file, to that company, (Tensas Delta Land Co.) informing it of the settlement of that controversy, which said basis of settlement was distributed by said company, under date of January 7, 1946, to all concerned, including affiant, directly or through taxpayer Hudson—all of which is shown by copies thereof in affiant's said official files." The affidavit of Savage further recites:

"Affiant further states that, according to his clear recollection and from copy there-

of and of letter transmitting same in his said file, on March 20, 1946, Mr. Hudson wrote the collector of Internal Revenue at New Orleans, transmitting a claim for refund, which affiant had prepared, seeking refund of the entire amount of the deficiency assessment payments which he had paid to Revenue Agent Kennedy of the Monroe Office of the Bureau of Internal Revenue on September 22, 1944.

"There can be no error or doubt that on that date, March 20, 1946, Mr. Hudson mailed that claim and letter to the Collector. It was done in my office, in my presence and with my assistance and cooperation. It is borne out by the records in my official files and the fact of it is clear and definite within my recollection. I was aware at the time that the amount of that claim, One Thousand, Three Hundred and $^{65}/_{100}$ ($1300.65) Dollars, each, which was the full amount paid, was in excess of the amount properly allowable under the Bancroft formula, but yielded to Mr. Hudson's insistence that claim be made for the full amount of the deficiency assessment.

"Thereafter on numerous occasions, Mr. Hudson complained to affiant as to failure of action upon said claim and was repeatedly assured by affiant that such and even greater delays are not unusual in such matters; that in some instances such papers become misdirected, misplaced or even lost altogether; whereupon, later, Mr. Hudson reported to affiant that he had visited personally the Collector's office at New Orleans and was there referred to several officials but that none of them seemed to locate his claim or to know anything about it. I reassured him because such was not unusual in other cases within my experience and the papers usually turned up in the Office of the Commissioner at Washington or in the Collector's Office at New Orleans or elsewhere, if misdirected. Finally, on March 12, 1947, having still heard nothing, I prepared for Mr. Hudson a second refund claim, wherein I carefully calculated and computed, in accordance with the Bancroft case method, which amended claim, showing the correct amount of said refund to be Eight Hundred Twenty-seven and $^{48}/_{100}$ ($827.48) Dollars, due each Mr. Hudson

and his wife; which second refund claim we transmitted to the Collector by Registered mail, I believe—with a full letter of explanation, but of which second claim no acknowledgment was ever received by Mr. Hudson, and none at all until, under date of November 21, 1947, Mrs. Hudson received a letter from the Deputy Commissioner at Washington, calling for the furnishing of 'conclusive' evidence of the original filing of said claim and advising that the only such evidence acceptable would be a 'receipt from the collector' or 'his stamp on a retained copy'—neither of which was it possible to supply, because the Collector never acknowledged such receipt and had no opportunity to put his stamp upon the copies which were retained both in my file and in that of Mr. Hudson."

"Affiant further states that he has examined the exhibits attached to the foregoing petition to which this affidavit is annexed, and from comparison with his files, attests the verity of the documents marked * * *."

Complainants also offered another affidavit by John I. Kennedy (Exhibit T), reciting the facts as to demand and receipt of payment of the claimed deficiencies, as stated earlier, and further reciting:

"* * * after the test case had been determined in taxpayer's favor, affiant on several occasions reminded Mr. Hudson to make timely claim for refund and was informed by Mr. Hudson in the early spring of 1946 that Mr. Savage had prepared the claim and same had been filed with the Collector at New Orleans.

"Affiant further says that the reason he is certain as to the approximate time Mr. Hudson informed him of the filing of said refund claim, is that they were friends, saw each other not infrequently in the Ouachita National Bank Building; that, having as Revenue Agent, persuaded Mr. Hudson to make said payment of said deficiency assessment, and having computed and made detailed official reports relative to the transaction, affiant felt a measure of responsibility toward Mr. Hudson, especially when that collection was subsequently determined to have been improper; and affiant impressed upon Mr. Hudson the

necessity for and importance of timely filing a refund claim and advised him as to the period within which same should be filed; and, by repeated inquiry until the early spring of 1946, approximately in March or April, affiant ceased interest or inquiry when then being informed by Mr. Hudson that said claim had theretofore been actually filed in form prepared by taxpayer's tax consultant, Mr. Walter S. Savage, with whom on several occasions affiant also discussed the matter and who, likewise, so informed affiant.

"Affiant further states that thereafter about one year or so, Mr. Hudson informed him and complained to him of the delay in obtaining action upon said refund claim and affiant reassured him that such delays were not unusual and that affiant had known of the papers in such matters being lost or misplaced in the Bureau.

"Affiant further states that he has examined the exhibits attached to the foregoing petition to which this affidavit is annexed and attests the correctness of documents marked Plaintiffs' Exhibit A, which embodies the report I personally made on this case and Exhibits B—(1) and (2).

"Further affiant states that the entire episode is distinctly in his memory because he, while Revenue Agent, handled several similar cases with other local stockholders of the Tensas Delta Land Company, (Murray Hudson, Gordon Cummings, Mrs. Flora M. Potts and others), as to most if not all of whom he followed the same procedure as to timely filing of refund claims and it is affiant's information and understanding that refunds have been made in all cases involved except that of Mr. Hudson."

There is in the record also another affidavit by Otto Passman, member of the House of Representatives of the United States, to the effect that he had received from complainant, Fred G. Hudson, Jr., a letter dated December 16, 1946, requesting that he, Passman, take up with "the office of the Commissioner of Internal Revenue" the claims for refund, giving full details, and that in the latter part of January or early February, 1948, he had taken up with "J. R. Brelsford, chief of section in the office of the Commissioner of Internal Rev-

enue at Washington," the matter of complainants' claims for refunds; that Brelsford produced the taxpayer's file, and after full discussion and review of same, he "informed me that Mr. Hudson's claim appeared to be perfectly valid, proper and acceptable, except as to proof of date of original filing, as to which he would deem the affidavits of Mr. Kennedy and Mr. Savage adequate; which information I transmitted promptly to Mr. Hudson under date of February 3, 1948; and I was shocked to learn that on the same day or the day following, Hudson's claim was finally rejected; without any opportunity being allowed him to furnish such affidavits."

And finally the affidavit of John W. McCurdy, Chicago, Illinois, Secretary-Treasurer of the Tensas-Delta Land Company, out of whose affairs the disputed income was received, verifying the exhibits connected with the claim of the stockholder in the test case before the Tax Court, Mrs. Charles G. Bancroft, to the effect that he was the executive officer who kept in touch with and advised the other stockholders as to the progress and final settlement of that case; that he frequently visited Monroe, Louisiana, the home of complainants, and "during the early spring of 1946, in furtherance of his said policy and duty to the stockholders, affiant made inquiry of Fred G. Hudson, Jr., and was assured by him that he had filed refund claims with the Collector in New Orleans covering the deficiency assessments" paid by Hudson in September, 1944, of which payment affiant had previously been informed; and finally, his certainty as to the time factor was due to the fact that he had discussed with Hudson the matter of whether or not claims had been filed for the entire payments, as well as details of the formula or method employed in settlement of the Bancroft case.

### Defendant's Proof

On behalf of the defendant, there was filed in evidence an affidavit by Charles A. Donnelly, the pertinent part of which is as follows:

"1. I am now and have been since February 1, 1946, the duly appointed Collector of Internal Revenue for the District of Louisiana.

"2. In the ordinary course of business claims for refund received through the mail by my office are recorded on the records of the office showing that such claims have been received and the date of their receipt.

"3. After March 20, 1946, the alleged mailing date of the alleged claims for refund allegedly dated March 20, 1946, and upon inquiry being made on behalf of the plaintiffs herein relative to such alleged claims, an examination was made of the records of my office and the records showed then and show now that the said alleged claims for refund were never filed in or received by my office.

"4. The records of my office further show that the only claims for refund of the plaintiffs for the year 1941 which have been received by my office are those claims for refund which were executed in April and May of 1947."

Giving effect to this evidence on both sides, the result is that on the part of the plaintiffs, we have substantial and undisputed proof of the preparation, execution and mailing of the claims for refund on March 20, 1946, within eighteen months after the payment on September 22, 1944. The affidavit of the Collector in substance amounts to this: He was at the time of the mailing on March 20, 1946, and at the making of his affidavit on January 30, 1950, Collector of Internal Revenue for the Louisiana District and that "in the ordinary course of business, claims for refund received through the mail by my office * * show a date of receipt"; that "subsequent to March 20, 1946" (the exact date not stated) when plaintiffs inquired relevant to such alleged claims, "an examination was made of the records of my office, and the records showed then and show now that the said alleged claims for refund were never filed in or *received by my office*" (italics by the writer); and that "the only claims for refund of the plaintiff for the year 1941 which have been received were * * * executed in April and May, 1947". (These were amended claims for

the reduced amount due on the basis of settlement in the test case of Bancroft.)

Giving this affidavit of the Collector its full effect, it is a statement that, as head of the office for the District of Louisiana, he personally never received or filed the claims, the mailing of which is unquestionably proven by the evidence of plaintiff, and that records of the office have been checked and nothing could be found to show such receipt or filing by anyone else employed therein. Of course, in view of the volume of the business handled by that office, there are no doubt hundreds, perhaps thousands, of such claims requiring the services of many employees in receiving and properly recording them, but the Collector alone denies the receipt in this instance, no doubt as a result of examinations and checks made by those under his supervision and control, rather than by him individually, for his statement is, not that he had made the check, but that "an examination was made * * * and the records show then and show now that * * the claims were never filed in or received by my office." In other words, the claims were timely prepared and mailed, but a check of the Collector's office fails to show any record thereof.

 The question is, therefore, as to the legal consequences of this state of the record in this case. There is unquestionably a presumption, when positive proof of the preparation and placing in the U.S. mails of a letter or document is submitted, that it was received by the one to whom it was addressed, in the absence of convincing evidence to the contrary. On the other hand, there is also a presumption that those whose duty it was to receive and file the papers performed that duty. There is here, however, evidence to the effect that, as a matter of common knowledge, there have been many instances where such claims, because of their large number, have been lost or misplaced and later found, without record thereof being made, which weakens considerably the presumption as to the performance of these duties, when compared to the long established and well-recognized efficiency of the mails.

The statute fixing the period of limitation for making claim for refund, as in this instance, is Section 322(b) (1) of the Internal Revenue Code, 26 U.S.C.A. § 322 (b) (1), reading as follows: "(b) Limitation on Allowance (1) Period of limitation. Unless a claim for credit or refund is filed by the taxpayer within three years from the time the return was filed by the taxpayer or within two years from the time the tax was paid, no credit or refund shall be allowed or made after the expiration of whichever of such periods expires the later. If no return is filed by the taxpayer, then no credit or refund shall be allowed or made after two years from the time the tax was paid, unless before the expiration of such period a claim therefor is filed by the taxpayer."

Complainants' brief, following a rather extended criticism of the methods of the Collector's Office and the claimed unfairness of being denied refunds, in view of the undisputed fact that the overpayments were made, cites Section 196 of 20 American Jurisprudence as to the presumption of receipt of matter entrusted to the mails, including a long list of decisions of the U.S. Supreme Court, some Louisiana decisions, Volume 31 of C.J.S., Evidence, § 136, pp. 777-778, and many other decisions in the footnote of the latter work.

Counsel for plaintiffs next proceeds to analyze the authorities relied upon by the defendants. Without deeming it necessary to follow or discuss all of them in detail, it is sufficient to consider briefly some of the decisions of the Courts of Appeal and the Supreme Court dealing with similar situations, although none of them are exactly to the point involved here.

Taking first Poynor v. Commissioner, 5 Cir., 81 F.2d 521, 522, we find that it involved the mailing by the taxpayer to the Board of Tax Appeals a petition for the re-examination of an alleged deficiency in the tax return. Counsel for complainants calls attention to the clear provisions of the statute involved there, the Revenue Act of 1934, construed by Judge Walker of this Circuit as meaning: "Those provisions negative the conclusion that the Board of Tax Appeals has the right or power to

consider a petition for a redetermination of a deficiency where such petition is filed with it after the expiration of the prescribed period." Counsel also points to the fact that the taxpayer in that case waited until the 19th of the month before mailing the petition which was due to be filed with the Board on the 21st, and that it was not received in Washington until the 23d, which made positive proof that it did not reach its destination. He also calls attention that the taxpayer had another remedy by "paying the tax under protest and suing for a refund"; whereas, in the present case, if it be held the claim was not timely received in the Collector's office, then the right to recover will, admittedly, have been lost entirely.

Complainants also remind us that, in another case cited by the Government, Lewis-Hall Iron Works v. Blair, 57 App. D.C. 364, 23 F.2d 972, the taxpayer had waited until the last day for filing a petition for re-examination of a jeopardy assessment and then pushed it through a slot in the door at the offices of the Board at 7:10 P.M., after office hours, when there was no one there, and that the time for filing expired at midnight on the same day. He also correctly contends that one of the grounds for refusing to consider the petition was that the taxpayer had failed to deposit a $10.00 filing fee until ten days after the time had expired.

McDonald Coal Co. v. Lewellyn, 9 F.2d 994, 995, was by a District Court, in an action at law, in which the plaintiff sought to recover taxes paid on its own return. The court, after finding that "as a matter of law there is no substantial evidence to support any judgment in favor of the plaintiff, and that defendant is entitled to have judgment entered in [its] favor," proceeded to discuss as "an additional reason * * * why there should be no recovery" the finding that no waiver of time limit for determination of the matter had been "filed * * * as required by the act." Section 281 (e) of the Revenue Act of 1924, 26 U.S.C.A.Int.Rev.Acts, page 63, was quoted in the case as follows: "If the taxpayer has within five years from the time the return for the taxable year 1917 was due, filed a waiver of his right to have the taxes due for such taxable year determined and assessed within five years after the return was filed", the claim could be considered.

It was found from the evidence that: "* * * the attorney for the plaintiff corporation undertook to file a waiver under this provision of the act of Congress, *but there is no evidence that that waiver was actually filed.* The evidence discloses that the attorney for the plaintiff wrote a waiver, that it was signed by an officer of the plaintiff corporation, and that it was deposited in the post office at Pittsburgh for mailing to the Commissioner of Internal Revenue. There is no evidence of its receipt there. The act required the waiver to be filed. The act imposes upon the taxpayer the duty of seeing that his waiver actually reaches the proper office for filing. That responsibility is his, and the burden rests upon him actually to convey the waiver to the Commissioner's office. The waiver was not in the files; there is no evidence that it ever actually reached the files. In our opinion, the act of Congress was not complied with until the waiver was actually filed with the Commissioner. The duty of the taxpayer was not discharged under this statute merely by depositing the waiver in the post office. He had the duty of seeing that it was received by the Commissioner of Internal Revenue for filing. If he chooses to trust the mails, rather than to make delivery to the Commissioner in person, it was at his own risk." (Emphasis by the writer.) I am not in accord with this legal conclusion for reasons later stated.

In McRae v. Woods, Em.App., 165 F.2d 790, cited by the Government, a rent control case, the following language appears in the syllabus and needs no further discussion: "Mere verification of complaint before notary public within 30-day period fixed by Emergency Price Control Act for filing of complaint could not be treated as equivalent of filing, so as to give Emergency Court of Appeals power to determine issues which complaint sought to raise, where complaint itself is not filed in

Clerk's office until after expiration of the 30-day period. Emergency Price Control Act of 1942, § 204 (e), as amended 50 U.S.C.A. Appendix, § 924 (e)."

In Park Management, Inc., v. Porter, 157 F.2d 688, 690, another rent control case, by the Emergency Court of Appeals, the regulations provided: "All notices, reports, registration statements and other documents which a landlord is required to file pursuant to the provisions of any maximum rent regulation, shall be filed with the appropriate defense-rental area office, * * * Provided, that any such notice, report, registration statement or other document properly addressed to *and received by said office* shall be deemed filed on the date of the postmark." (Italics by the writer.)

It is to be noted that the regulations specifically required the actual receipt by the Rent Control Office of the paper; whereas, in the present case, the language used is that "unless a claim for credit or refund is filed * * *, no credit or refund shall be allowed or made * * *." This last case cites U.S. v. Lombardo, 241 U.S. 73, 36 S.Ct. 508, 60 L.Ed. 897, and quotes therefrom as follows: " * * * our attention has not been called to any case which decides that the requirement of a statute * * * that a paper shall be filed with a particular officer, is satisfied by a deposit in the post-office at some distant place. To so hold would create revolutions in the procedure of the law and the regulation of rights. In instances it might, indeed, be convenient; in others, and most others, it would result in confusion and controversies; and we would have the clash of oral testimonies for the certain evidence of the paper in the files."

The Lombardo case dealt with a question of criminal law under the White Slave Traffic Act, Act June 25, 1910, 36 Stat. 825 [Revised 18 U.S.C.A. §§ 2421–2424], Section 6 of which required anyone who kept or maintained control over, harbored, etc., any alien woman for purpose of prostitution within three years after she had entered the United States, to "file with the Commissioner General of Immigration a statement in writing," giving facts as to place where said woman was kept, port through which she entered, age, nationality, etc., and further provided that failure to do so within thirty days after said control had commenced, or the willful failure to disclose any of the required facts in such statement within his knowledge or belief, should constitute a misdemeanor, etc. The indictment was returned in the Western District of the State of Washington, and pleas both of unconstitutionality and to the jurisdiction of the court were urged, the latter on the ground that the place where the statement had to be filed was with the Commissioner of Immigration in the City of Washington, D.C. Both points were sustained by the trial court, but the Supreme Court considered only the question of jurisdiction and rejected the contention of the prosecution that it was a "continuing" offense, extending from said District of Washington State to Washington, D.C., and the further contention that the filing of the statement need not be at the office in Washington but "may be deposited in the Post Office of the United States addressed to the Commissioner General." as a compliance with the requirement for "filing" at that office. In its ruling, the language quoted above was used. The contention that the offense was a continuing one was rejected, and it was pointed out that the statute itself declared that the "failure to file" or the filing of false statements with the Commissioner General of Immigration, constituted the offense, and that this meant that the law contemplated such offenses could be committed only in the City of Washington, D.C.

In the present case, the section involved does not say where the claim for refund shall be filed. The court in the last-cited case emphasized the fact that the papers "shall be filed with a particular officer" and this was not "satisfied by a deposit in the post-office at some distant place."

Of course, this was a criminal case in which the rules of strict construction were unquestionably required.

There are many other cases cited on both sides, but the authorities thus reviewed afford a fair sample of what has been held, in each instance, the result depending upon the peculiar circumstances involved.

Here we have a situation where equity and fair dealing would seem to have induced the Commissioner of Internal Revenue, in the light of all the circumstances, to have considered the affidavits relied upon here, and to pursue such course as law and justice required, rather than to reject the claims in the manner described by the witness Passman. Necessarily, in the interest of the public fisc, the tax-gatherer is given very broad powers when dealing with the taxpayer, including a statutory declaration that no injunction shall lie but that the amount demanded shall be paid and the taxpayer relegated to the courts for refunds, no matter how arbitrary the position of the Collector may be. These people are not infallible, any more than the rest of us, and it would seem that, in view of the very harsh and extreme powers thus exercised, it is the duty of the courts to endeavor to hold the scales of justice in balance to the end that the taxpayer's government may not persecute the very source from which it derives its means of existence. If the position taken here, in the light of the undisputed facts, insofar as it is possible to prove them (the only point not conclusively established beyond doubt being that the claims for refund actually came into the hands of some one of the numerous employees in the office of the Collector in New Orleans), then no matter how much carelessness there may have been in making the proper records, which would evidence the taxpayer's diligence in complying with the law, the latter would be without remedy simply because an agency, whose imperfections are proven in this case, failed to function in the manner intended. Can it be said that the taxpayer, in addition to the other handicaps under which he labors, must go in person and deliver such papers into the hands of the Collector, or else lose his rights? I am constrained to believe

that the question here turns upon the overwhelming preponderance of the evidence that the claims did reach the Collector's Office, in time, and that to deny relief would be to penalize those who were induced by the same agency of the Government to make the payments; whereas the others who did not pay until the test case was decided, escaped having to file such claims.

The record in this case indicates that, but for the persistence of the Deputy Collector at Monroe, these taxpayers could have safely awaited the outcome of the Bancroft case and then paid what was due, about one-third of the sums demanded, and avoided any such issues as are presented here. In that event, the matter would have remained in abeyance, and this controversy would never have arisen. The deputy Collector has very frankly supported the taxpayer in every issue of fact, except to be able to say that the claims actually reached the Collector's office within the delay of the statute, including the statement that he made timely inquiries and was assured by Mr. Hudson that the claims had been filed.

It cannot be believed that a just government would take advantage of this technical defense to deny to its citizens that which all considerations of equity and fair dealing would seem to demand. I am not unmindful of the multitude of conflicts in proof that could arise if the door were thrown wide open for indiscriminate assertions of claims relying upon the fallible memories and statements of human beings. No doubt, it was this which induced the late Justice McKenna to use the language employed in the criminal case of U. S. v. Lombardo, supra, in which he announced the general principle. However, it cannot be denied that there is scarcely any such general rule which does not have its exceptions where the facts and circumstances warrant. It is my belief that this case is such an exception and that the complainants here are entitled to recover.